MARY E. BIVINS ET AL V. FOY PROCTOR ET AL.

No. 6305. Decided March 27, 1935.
Rehearing overruled May 1, 1935.
(80 S. W., 2d Series, 307.)

*W. R. Smith,* of Odessa, *James R. Tobert, Vance Huff,* and. *Underwood, Johnson, Dooley & Simpson,* of Amarillo, for plaintiffs in error.

The association of persons was a partnership and as such each person was responsible for one-third of the profits and losses of the concern. Whitcomb v. Converse, 119 Mass., 38, 20 Am. Rep., 311; Heran v. Hall, 1 B. Mon., (Ky.) 159; Gore v. Vines, 72 W. Va., 783, 79 S. E., 820.

*E. M. Whitaker* and *J. M. Caldwell,* of Midland, and *Goree & Rice,* of Fort Worth, for defendants in error.

MR. JUDGE GERMAN delivered the opinion of the Commission of Appeals, Section A.

Plaintiffs in error, Mary Bivins and others, legal representa-

tives of the estate of Lee Bivins, deceased, were plaintiffs in the trial court and will be so designated here. Leon Goodman and Foy Proctor were defendants in the trial court and will be so referred to in this opinion. Suit was brought by plaintiffs to recover of defendants two third of the losses sustained in a partnership venture between Lee Bivins, Goodman and Proctor. The enterprise was one involving the buying, handling and selling of cattle. It began about October 1, 1928, and terminated with the death of Bivins on January 17, 1929. On account of the death of Bivins the testimony with reference to the agreement between the parties consists almost entirely of letters, book entries and various circumstances. Briefly, the enterprise involved the furnishing of certain cattle by Bivins, the acquisition of other cattle, for which Bivins advanced a part or all of the purchase money, the pasturing, handling and sale of the cattle, Goodman and Proctor giving their time and service thereto, with a division of net profits after a sale of the cattle. The opinion of the Court of Civil Appeals reported in 49 S. W. (2d) 824, furnishes an additional statement.

The trial court in submitting the case to the jury apparently proceeded upon the theory that the relation between the parties was a partnership. The Court of Civil Appeals held: "The evidence leaves no doubt a partnership relation existed. The firm name was Bivins, Proctor & Goodman." As we are convinced that the evidence as a whole leads to the conclusion reached by the Court of Civil Appeals, we shall proceed upon the theory that there was a partnership.

The contention of plaintiffs is that although Bivins furnished cattle to the partnership and advanced money for the purpose of buying cattle by the partnership, for all of which he was to be repaid, his contribution became assets or property of the partnership itself; and although Goodman and Proctor furnished only their labor and services (and in some instances their credit also) in buying, caring for and selling the cattle, the loss sustained in the venture was a partnership loss which should be borne equally by the partners. That as Bivins had borne the loss, his estate was entitled to recover of the other two partners their proportionate share of same.

It is the contention of defendants that the cattle furnished by Bivins and those acquired by the partnership for which he advanced the purchase money did not become the property of the partnership, but that the partnership only had the use of same; and as their contributions to the venture, consisting of

time, labor and services, were lost, they are not required to make good any portion of the loss sustained by Bivins. They also contended that the facts and circumstances raised an issue of fact as to a special agreement that they were not to share losses of the venture.

Beginning with the premise that there was a partnership, we think it clear that the trial court submitted the case upon a wrong theory, and the Court of Civil Appeals erred in affirming the judgment on that theory.

1 It appears to be almost universally recognized that if a partnership exists, whether formed by a contribution of money capital on the part of the constituent members, or by the contribution of money or property on the part of one and the contribution of labor or service on the part of another, with an agreement to share profits, in the absence of some special agreement to the contrary, it will be implied that all of the parties were to share the losses. In other words, if a partnership is shown, and nothing more, it is presumed that the partners are equal as to both profits and losses. This has been specially provided by statute in many states, which statutes have been held to be but a statutory recognition of the common law rule.

While there are cases tending to hold that where one party furnishes the capital and another labor or services, there is no right of contribution in favor of the former against the latter for losses incurred in conducting the business, yet a careful consideration of such cases will show that they do not establish the general rule, or even qualify it, but are cases where the proof established a particular fact situation by which it was shown that there was in reality a specific agreement which fixed the rights and liabilities of the parties. In our opinion, the general rule is that regardless of how the capital of the partnership is formed, if there in reality be a partnership, "it requires a special agreement to prevent the conclusion of a community of interests in the property as well as in the profit and loss." Most of the statements of text writers on the question are quoted in the case of Johnston v. Ballard, 83 Texas, 486, 18 S. W., 686. Perhaps the best statement of the rule applicable under the facts of the present case is found in the case of Cameron v. Watson, 10 Rich. Eq. (S. C.) 64, 88, and is as follows:

"A participation in the profits and loss will make the partners liable as such to all persons dealing with the firm. And no stipulation to the contrary would exempt them from this

liability which the law imposes upon them. Consistently with this rule, and as among themselves, they may modify and vary their rights in any manner they may think proper. The terms of the contract of co-partnership, will become the law by which their rights and liabilities, as among themselves, will be determined.

"In this instance, whether Cameron, who put in no capital, but was to receive half the profits, is to contribute to Watson for the loss of the capital which he put in, and which has been sunk in the operations of the firm, the contract is silent, except in the way of an implication, which I will hereafter notice. I am, therefore, left to decide this question, not so much upon a construction of the contract, as upon the general law of the land applicable to the subject. The paucity of authorities bearing directly on this point has surprised me. Neither has the argument, nor have my own researches, furnished me with any thing authoritative or reliable. In the absence of any decision, or precedent, by which I might be guided, I must appeal to principles more general and comprehensive.

"A participation in profit and loss enters into the *nature of a partnership*. It is this which renders each member of the firm liable to creditors in respect to his individual estate, without reference to the amount of the capital which he contributes, or the share of the profits which he is to receive. The partners may stipulate among themselves, that one shall receive any given share or proportion of the profits, and sustain none of the loss. But I apprehend, that in the absence of any stipulation to this effect, the general idea of a partnership must prevail, namely, that each member is entitled to a share of the profits, and is liable to bear a share of the loss. And in the absence of any such stipulation, as would become the law of the contract upon the subject, the proportion which the partners were to receive of the profits, (if profits were realized), would furnish the true and just criterion by which their respective proportions of the loss should be determined. And, inasmuch as the plaintiff was by the agreement to have received one-half of the profits, he is, in my judgment, liable to contribute to the defendant for one-half of his lost capital.'"

2 Proceeding upon the theory that there was a partnership, and evidently upon the further theory that the evidence raised the issue as to the existence of a special agreement by which Goodman and Proctor were exempt from the general rule as to sharing losses, the trial court submitted Special Issues No. 1 as follows:

"Do you find from a preponderance of the evidence that Lee Bivins, Leon Goodman and Foy Proctor engaged in the cattle transactions in question with the intention, understanding and agreement that Leon Goodman and Foy Proctor should share in any losses, if any, as well as any profits, if any, that might result from said transactions?"

The dominant question in the case was whether or not there was a partnership. The burden resting upon the plaintiffs was met when such relationship was established, and the burden of proof necessarily rested upon defendants to establish by a preponderance of the evidence a special agreement qualifying or limiting the general rule that prima facie a loss of capital is to be equally borne by the partners, or borne in the proportion in which they share the profits. If therefore we consider that the trial court found as a matter of law that there was a partnership and intended to submit the further question of a special agreement as to sharing losses, it is obvious that there was error in placing the burden of proof upon the plaintiffs as to the foregoing issue. In addition to charging the jury to the effect that the issues would be answered from a preponderance of the evidence, the court instructed the jury as follows: "The burden of proof is upon the plaintiffs to establish by a preponderance of the evidence the affirmative to Special Issue No. 1."

3, 4 Defendants however argue that there was evidence sufficient to raise the issue of a special agreement which would overcome the presumption of equality of liability for losses. They do not argue that there was any evidence of an agreement to exempt them from sharing losses as such, but the basis of their argument is that the evidence in the case tended to show that the cattle which were furnished by Bivins and which were purchased with money furnished by him never became the property of the partnership, but that only the use of same was contributed, instead of the property itself, and therefore no part of the loss on such property should be borne by them. They claim that the situation brings them within the ruling in such cases as Masterson v. Allen, 69 S. W. (2d) 539; Strawn National Bank v. Marchbanks, 74 S. W. (2d) 447; Simpson v. Fulcher, 45 S. W. (2d) 1012 and Johnston v. Steele, 48 Texas Civ. App., 335, 107 S. W., 631. If this be true, it is obvious that Special Issue No. 1 should not have been submitted at all, as it had no relation to the question of the ownership of the cattle. If it be assumed that the evidence relied upon by plaintiffs to establish a partnership relation likewise

showed as a matter of law that Bivins retained title to the cattle (as defendants now argue), then the trial court should have instructed a verdict in favor of defendants. But if the evidence only raised an issue of fact as to whether or not Bivins retained title in himself to the cattle and showed therefore that he should sustain the full loss, it is obvious that this theory of the case was not submitted at all, and there was error in refusing to submit plaintiffs' Special Requested Issues Nos. 1 and 2, or some similar issue. These issues were as follows:

"Special Requested Issue No. 1.

"Was it agreed by and between Lee Bivins and Leon Goodman prior to January 17, 1929, that Lee Bivins, Foy Proctor and Leon Goodman should be equally interested in the cattle in question?

"Special Requested Issue No. 2.

"Do you find from a preponderance of the evidence that Lee Bivins and Foy Proctor and Leon Goodman were interested as equal partners in the cattle in question handled for the account of Bivins, Proctor & Goodman?

"In this connection you are instructed that a partnership is the relation which arises when parties hold in common certain property intended for use in business with a view to profit for their mutual benefit."

Without giving our full approval to these requested issues, we hold that they are sufficient to indicate to the trial court the manner in which plaintiffs' theory of the case should have been submitted. We conclude, however, that the question of the real ownership of the cattle by the partnership was settled as a matter of law, as will hereinafter be shown.

In the trial court plaintiffs made request for an instructed verdict in their favor, and are here strongly urging that the judgment be reversed and rendered in their favor. This has presented the most difficult question for decision. As shown above, the Court of Civil Appeals held as follows: "The evidence leaves no doubt the partnership existed." We concur in this conclusion, and are of the opinion that Goodman and Proctor were both members of the partnership. We reach this conclusion as to Proctor from evidence other than letters written by Goodman, which Proctor claimed were not binding on him. We are unable to see how defendants can be relieved from the evidentiary effect of the affidavits which they each made shortly after February 1, 1929. Among other things the affidavit of defendant Proctor contained the following:

"Foy Proctor, of lawful age, being first duly sworn, upon oath deposes and says that:

"Prior to the death of Lee Bivins, he, together with Lee Bivins and Leon Goodman were engaged in the business of buying, selling and running cattle on an equal partnership basis, that the partnership of Bivins, Proctor & Goodman, among other cattle, own the cattle hereinafter described by brand, age, kind, number and location.

"* * *

"That said Foy Proctor, as a member of the partnership of Bivins, Proctor & Goodman, hereby acknowledges and ratifies the above described notes and mortgages as the obligation of the firm of Bivins, Proctor & Goodman and acknowledges that he, and the partnership of Bivins, Proctor & Goodman are bound and liable to pay the same as though he had executed same."

The affidavit of Goodman was to a like effect.

With the partnership unquestionably established by the proof, and there being no evidence whatever of any special agreement directly concerning the sharing of losses which would overcome the prima facie presumption that losses were to be borne in the same proportion as profits, we come to inquire into the matter of the intention of the parties as to the ownership of the cattle.

It is upon the basis of the claim that the evidence showed that Bivins contributed merely the use of the cattle and his money as his contribution to the capital of the partnership, which was set over against the labor and services of Goodman and Proctor, as their contribution to the capital of the partnership, that defendants argue that there was "an intention, understanding and agreement" that they were not to be liable for losses. Before referring to the evidence touching this matter we will undertake to clarify to some extent the rules of law applicable, because we find much confusion in some of the general statements of the law, and especially in the quoted statements contained in the opinion of the Court of Civil Appeals.

A partnership in its very nature involves the essentials of a "community of interests, the common enterprise, its operation for a joint account, and the right in the owner of each interest to share as a principal in its profits as such." Freeman v. Huttig Sash & Door Co., 105 Texas, 560, 153 S. W., 122, Am. Cases, 1916E, 446; Fink v. Brown, 215 S. W., 846. Proof therefore of the partnership being made—nothing else

appearing—there would be prima facie a community of interests in the capital, with an implication of law that each owner would participate in losses; but such is seldom the case, and the underlying general rule is that "whether a loss of capital is a partnership loss, to be borne by all the parties, depends upon the nature and extent of the contract of partnership."

There are cases of which Heran v. Hall, 1 B. Mon. (Ky.) 159, 35 Am. Dec., 178, is typical, where the court found a special agreement that money was furnished by one party as his contribution to the capital, while labor and services were furnished by another as his contribution to the capital, the labor and services being estimated as of equal value with the money, and it was properly held that "in such a case each will have sustained a correspondent loss of his capital, and neither of them would be liable to the other for contribution." Obviously that situation did not exist in this instance.

There is another line of cases of which Meadows v. Mocquot, 110 Ky., 220, 61 S. W., 28, and the cases above referred to are typical, where the use of money or property was contributed by one partner over against the labor and services of another, the one contributing the money or property retaining title thereto, and expecting to realize interest thereon or from the use thereof from the profits of the venture, in which event the one contributing the labor and services was not liable for contribution to losses sustained by the other. In each of the cases mentioned there was a special written agreement to that effect or a finding that such was the nature of the contract.

There is a line of cases where property or money itself, as distinguished from its mere use, was contributed on the one part and labor and services on the other, and in those cases it has been held that losses of capital must be borne by all partners. Some of these cases are: Whitcomb v. Converse, 119 Mass., 38, 20 Am. Rep., 311, and cases there cited; Gore v. Vines, 72 W. Va., 783, 79 S. E., 820; Buie v. Kennedy, 164 N. C., 290, 80 S. E., 445; Taft v. Schwamb, 80 Ill., 290; Savery v. Thurston, 4 Ill. App., 55; In re Hall et al, 32 R. I., 424, 79 Atl., 966.

The present case, as clearly shown by the proof, falls in this class of cases, and particularly with those where one partner has advanced money for the purchase of property, such purchase being for and on behalf of the partnership itself. We think there is no doubt that Bivins actually sold cattle which he already owned or had under contract to the partnership,

instead of merely contributing the use of same, and that as to cattle bought by Goodman and Proctor, for which Bivins advanced part of the purchase money, they were bought by and for the partnership.

The total number of cattle held by the partnership at the date of Bivins' death was approximately 9000 head. Most of these cattle were acquired under contracts by which 25 per cent of the purchase price was paid in cash, and the remaining 75 per cent was obtained by execution of notes and mortgages to cattle finance companies, and then paid to the sellers of the cattle. In two instances Goodman and Proctor purchased the cattle, drew on Bivins for the 25 per cent cash payment, executed notes for $67,800.00 and $61,526.22 and mortgages to secure same, then sent the notes and mortgages to Bivins for execution. As to some 5166 head of the cattle it appears that Bivins had paid the 25 per cent cash payment and had executed mortgages for the remaining 75 per cent, but shortly after his death the notes and mortgages aggregating $248,-745.00 were renewed and extended as partnership obligations as well as individual obligations of Goodman and Proctor. As is shown by letter of October 5, 1928, it appears that this was in line with the agreement of the parties from the beginning. In that letter it was said:

"After giving much thought to the matter it occurred to me that the best way to handle this business would be to put it under the name of Bivins, Proctor & Goodman and therefore we will carry everything under that name and will keep an accurate set of books.

"It is suggested that you open an account in this name *charging us* with the individual amounts advanced, also with the cattle furnished by giving us in each case the total of cost of the cattle, *the loan placed thereon* and the forfeit or balance advanced by you. I trust this will be entirely satisfactory, but if not you can advise how this is to be changed and we will of course do so."

We shall set out some of the other facts and circumstances bearing directly upon the propostion that the cattle were acquired with the intention that they should be partnership property and showing that an obligation on the part of the partnership to repay Bivins money advanced by him for the purchase of cattle and the expenses of the enterprise was clearly contemplated or necessarily implied.

On October 22, 1928, defendant Goodman wrote Smith, the bookkeeper for Bivins, as follows:

"So that we may have complete knowledge of all items of expense and cost, so as to know where we are at constantly we request that you send us a statement showing the exact cost of all cattle shipped here to the account of Bivins and Goodman.

"Also subject to Mr. Bivins' approval will you please change that account to Bivins, Proctor & Goodman."

On October 30, 1928, Proctor & Goodman, by Goodman, wrote Bivins as follows:

"We are enclosing bill of sale draft on the Agricultural Livestock Finance Corporation for four thousand six hundred sixty-three dollars and ten cents ($4,663.10), being three-fourths (¾) of the purchase price of 118 cattle which *we purchased for the account of Bivins, Proctor & Goodman* and we have asked the Loan Company to cover by mortgage to Proctor & Goodman.

"We are also drawing draft today against you for the purchase price which is six thousand two hundred seventeen dollars and fifty cents ($6,217.50), so that when this transaction is completed you will have the twenty-five per cent (25%) advance on your part and we will have a mortgage for the balance."

On November 16, 1928, defendant Goodman wrote Bivins as follows:

"Before sending you the list of the cattle which we are carrying here under the name of Bivins, Proctor & Goodman, I want to have everything checked and I will in the next few days send you the list and will appreciate your checking it over and then sending us a complete statement.

"Is it your wish that you *retain a half interest* in all of the cattle which we are carrying under the Bivins, Proctor and Goodman account, or do you want it to be *one-third* (1/3) Proctor and myself?

"Whichever you elect will be, of course, entirely agreeable to us, but I am satisfied that by having Mr. Proctor with us we will have a real asset as I personally think he is the best man in this country to handle cattle, and he is also just as good as you can find at selling and delivering cattle.

"So that we may know just what interest you wish to *retain,* please advise, and as I have previously said, we would be agreeable to either plan, although we would prefer to have it one-third (1/3) each."

On November 27, 1928, defendant Goodman wrote Bivins as follows:

"We are now trying to check all of the cattle and I hope that by tomorrow we can mail you a list of the cattle which we have received and you can then give us a statement so we will know just how these cattle stand as to cost and be able to keep proper records.

"Will you also let us know what you have decided about the manner in which you want these figured. I wrote you about a week ago asking whether or not you wished us to figure that Proctor and I would have a half interest or whether you wanted to figure that we would consider it on a one-third (1/3) basis to you, Proctor and myself."

On December 3, 1928, defendant Goodman wrote Bivins stating:

"Below is tabulated list as our books show the cattle being carried under the name of Bivins, Proctor & Goodman." (Then follows statement concerning cattle).

The letter then contains the following:

"It is requested that you check this and advise whether or not it agrees with your books, also that you give us a statement showing exactly how these cattle are billed to us and all charges that now show *as against us*."

On December 13, 1928, Proctor & Goodman wrote Smith, the bookkeeper, for Bivins as follows:

"Will you, at your early convenience, mail us a statement of the entire account of Bivins, Proctor & Goodman as shown on your books?

"It will be our plan to start a set of books based on your statement so that we can at all times know exactly conditions of our affairs."

On December 21, 1928, defendant Goodman wrote Bivins, among other things, stating:

"At your early convenience and after you have a chance of studying the statement of the cattle which we have here, let me know just what basis you would want to figure them on if Foy and I took them over as you suggested."

On January 2, 1929, defendant Goodman wrote Bivins as follows:

"It seems as if there was so much to do the short time you were here Monday that we did not get to know just how you preferred to handle the cattle being carried by Bivins, Proctor & Goodman.

"After thinking and talking the matter over with Foy we concluded that we preferred to handle the cattle with you as a partner, and you can know that we will do everything possi-

ble, not only to sell the cattle high, but to handle them at the lowest possible cost so that we can have a maximum of profit. You can know we are going to do the very best we possibly can.

"If it is agreeable to you we would prefer to handle these on a basis of one-third (1/3) around, and also any others that *we might buy here,* with your approval, on the same basis.

"If this is not satisfactory, of course, we will handle them as you determine, but if it is satisfactory we would like to do it on this basis."

On January 3, 1929, Bivins wired Proctor & Goodman as follows:

"One-third interest proposition in your letter satisfactory to me."

On January 4, 1929, Bivins wrote defendant Goodman as follows:

"The arrangement suggested in your letter, that is, yourself and Mr. Proctor to have a two-thirds interest and myself one-third interest in the cattle is satisfactory. Should you want to buy *my one-third,* I am open for a proposition."

Beginning on October 5, 1928, and continuing to January 9, 1929, twenty-three drafts were drawn in the name of Bivins, Proctor & Goodman on Bivins, some being drawn by Goodman, some by Proctor and some by Proctor and Goodman. On the back of a draft dated October 20, 1928, for $2,142.00 was a bill of sale by L. E. Beyer to Bivins, Proctor & Goodman for 42 cattle. On a draft of December 19, 1928, there was a bill of sale by H. L. Craddock to Bivins, Proctor & Goodman covering nine head of cattle. These drafts all showed on their face that they were for cattle, leases, freight, or other expenses in connection with the cattle business of Bivins, Proctor & Goodman.

An account was opened in the bank at Midland, Texas, in the name of Bivins, Proctor & Goodman.

On February 7, 1929, defendant Goodman executed an affidavit, and on February 11, 1929, defendant Proctor executed an affidavit, each being similar except as to name of the affiant, the pertinent portions being as follows:

"Prior to the death of Lee Bivins, he, together with Lee Bivins and Leon Goodman were engaged in the business of buying, selling and running cattle on *an equal partnership basis,* that the partnership of Bivins, Proctor & Goodman, among other cattle, *own* the cattle hereinafter described by brand, age, kind, number and location.

"That Lee Bivins, as a member of said partnership, was authorized and empowered by the partnership to mortgage said cattle; that he executed notes and mortgage covering the following described cattle to Southwest Livestock & Loan Co. of Kansas City, Missouri, for two hundred eight thousand three hundred twenty-seven and 62/100 ($208,327.62) dollars, dated the 22nd day of October, 1928; said mortgage is of record in Upton County, Texas: (Here follows description of 4344 head of cattle).

"That Lee Bivins also mortgaged the following described cattle to Southwest Live Stock & Loan Co. in the sum of forty thousand four hundred seventeen and 59/100 ($40,417.59) dollars, dated October 22, 1928, which mortgage is also of record in Upton County, covering the following cattle: (Here follows description of 822 head of cattle).

"That said Foy Proctor, as a *member of the partnership* of Bivins, Proctor & Goodman, hereby acknowledge and ratifies the above described notes and mortgages as the obligation of the *firm of Bivins, Proctor & Goodman* and acknowledges that he, and the *partnership* of Bivins, Proctor & Goodman are bound and liable to pay the same as though he had executed same.

"This affidavit is made for the use and benefit of the Southwestern Live Stock & Loan Co., their successors and/or assigns and the Lee Bivins Estate."

The witness H. W. Rowe, an accountant, testified to keeping a set of books at Midland, Texas, under the name of Bivins, Proctor & Goodman, covering these transactions from about October 1, 1928, to August, 1929. These books, among other things, contain a charge against the partnership of Bivins, Proctor & Goodman in favor of Bivins for the amount of moneys advanced by him and the value of cattle furnished by him to the partnership. Rowe testified to having prepared a statement as of date December 31, 1928, showing losses sustained by the partnership as of that date in the sum of $68,681.25, which statement was prepared for income tax purposes. On this statement he prorated this loss to Bivins, Proctor and Goodman on the basis of $21,227.17 each. Demand was made on defendants to produce copies of their income tax reports for the year 1928, and they refused to comply with the demand. On February 27, 1929, defendant Goodman sent a copy of this statement to Miles G. Bivins, son of Lee Bivins, deceased, and, among other things, stated:

"The audit is being completed on the affairs which we

carry in the name of Bivins, Proctor & Goodman, and a statement is enclosed which you can use for income tax purposes.

"Everything expended in connection with these cattle up to January 1st is added to the cost of operation, and in view of the fact that nothing has been sold these expenses are considered a net loss.

"Dividing this loss into three parts there is to be charged to Proctor, the Estate and myself, on our individual income tax return a loss on the Bivins, Proctor & Goodman Company of twenty one thousand two hundred twenty seven and 17/100 ($21,227.17) dollars each. * * *

"The attached statement shows the incidental expenditures as of January 1st, and our books covering payments are available for examination in every instance, for in the past, as well as in the future, nothing will be paid for only by check so that anyone, when our *partnership* is terminated, can audit and confirm our statement. * * *

"As understood and agreed, Proctor and Goodman, as surviving partners, will do all possible to liquidate by sale for cash all of the *partnership* cattle, after mortgages are retired which now exist and any monies advanced during the liquidation period are paid, the remaining monies will first be given the estate to liquidate the monies advanced and the credit given on our books to the account of Lee Bivins.

"Any remaining profit after this reimbursement will be divided equally between the three parties, namely, Lee Bivins Estate, Foy Proctor and myself.

"We will from now on keep an accurate set of books with regular trial balance periods and have the affairs in such shape that when final liquidation is completed we can submit all cancelled checks along with our books and statement to any auditor that you may select for checking and ratification.

"If this is not entirely clear or satisfactory do not hesitate to so advise us."

It seems to us these various circumstances and statements made by the parties themselves leave no room for speculation, and lead to but one conclusion, to-wit, that the cattle became the property of the partnership itself and constituted its capital. It is apparent to us that Bivins did not merely contribute the use of his cattle and money, along with his services, expecting to be compensated by profits as in the nature of interest for the use of his money, but that his money and credit were contributed for the purpose of buying cattle for the partnership; and that the cattle became the capital of the partnership

as such. This being true the authorities are uniform in holding that a loss or impairment of the capital must be borne by all the partners the same as any other loss. In Bates on Partnerships, Section 813, it is said:

"If there are no profits and the capital has been impaired or wholly lost, in dividing losses the deficit must be repaid like any other loss, for impairment of capital is a loss the same as any other, and is not to be reimbursed out of profits merely. That the capital has been contributed unequally and losses are to be equal makes no difference, or if the capital has been wholly paid by one partner, the other contributing services and skill, the latter who has lost his time owes to the former the same proportion of a loss of capital that he would be chargeable with had the losses not reached the capital, but had simply diminshed the profits."

Again in Section 815 it is said:

"As already stated, the fact that one partner has furnished all the capital and the other all the services does not alter the rule; the loss of capital is like any other loss, and the partner who contributes his services and loses them is debtor to the other for such share of the capital as represents the amount of loss he is to bear."

The cases cited illustrate the application of this general rule and it is unnecessary to quote from them. However, the language in the case of Buie v. Kennedy, supra, we think particularly pertinent under the facts of this case. There speaking of capital and its impairment the court said:

"The partnership, as an entity distinct from its individual members, becomes indebted to them for the capital they advance, and upon a settlement this debt should be paid just as any other liability of the firm, except that it is subordinate to the prior claims of creditors. As between the members and the partnership, it is a debt, and it makes no difference whether the capital was contributed in money or in money's worth, such as property."

It is difficult to conceive how the theory of the mere use of property or money by a partnership could have application under the facts of this case. Bates on Partnerships states that it rarely is ever applicable except in cases of the use of real estate or buildings by a partnership, which, after the termination of the venture, may be restored unimpaired to the individual owner. In Rowley on Partnerships, Section 277, it is said:

"If only the use of property owned by a partner is put in

the firm, it does not become partnership property, but if the property is to be used up in the firm business or sold and its proceeds used, this is evidence of an intention to make it firm property."

After the most careful consideration of the record, as well as many authorities, we are unable to find anything which will take this case out from under the general rule recognized by this court in Johnston v. Ballard, 83 Texas, 486, 18 S. W., 686, in this language:

"Mr. Justice Story says: 'In the absence, however, of all *precise stipulations* between the partners in respect to their respective shares in the profits and losses, and in the absence of all other controlling evidence and circumstances, the rule of the common law is that they are to share equally of both, for in such case equality would seem to be equity."

The same general rule was clearly stated in the case of Whitcomb v. Converse, supra, in this language:

"In the absence of controlling agreement, partners must bear the losses in the same proportion as the profits of the partnership, even if one contributes the whole capital, and the other nothing but his labor or services."

6 Instead of the proof tending to show the existence of a special agreement or special circumstances taking the case out of the general rule, we think it leads unmistakably to the conclusion that the cattle were acquired by the partnership, that the partners had a community of interest therein, with a community of interest in the anticipating profits as such, and that necessarily there was the implication of a community of losses. This leads to the conclusion that defendants Goodman and Proctor are liable to the estate of Bivins for their proportionate share of losses which were borne by Bivins.

Without going into a discussion of the question we state that after careful consideration of the matter we are of the opinion that the arrangement between Proctor and Goodman after the death of Bivins and pending the settlement of partnership affairs did not bind the Bivins estate, and the estate has done nothing which resulted in releasing Proctor from the liability imposed by law upon him as a surviving member of the partnership.

While there was a finding by the jury that the "total loss sustained in the cattle transactions in question" was $181,-357.01, we do not think defendants, under the state of the record, were required to bring up the question as to the correctness of that finding, and the correctness of the action of

the court in trying that issue and submitting it to the jury. For that reason we do not think judgment should be here rendered for plaintiffs on the basis of that finding.

The judgment of the trial court and the Court of Civil Appeals will be reversed and remanded, and the trial court is instructed to order an accounting for the purpose of determining the losses sustained by Bivins under the rules governing the settlement of partnership affairs by a surviving partner; and upon ascertainment of such losses to enter judgment in favor of plaintiffs against defendant Goodman for one third of the amount of such losses and against defendant Proctor for one third of same.

As no disposition of the cross-action by defendant Proctor against defendant Goodman was necessary under the judgment of the trial court as rendered, the case as to such cross-action is remanded for another trial.

Opinion adopted by the Supreme Court, March 27, 1935.