**David ASCH, Appellant,**

v.

**FIRST NATIONAL BANK IN DALLAS,**
**Appellee.**

**No. 15228.**

Court of Civil Appeals of Texas.

Dallas.

March 29, 1957.

Rehearing Denied May 10, 1957.

Second Motion for Rehearing Denied
June 7, 1957.

Morris I. Jaffe and Jay S. Fichtner, Dallas, for appellant.

Coke & Coke and Clinton Foshee, Dallas, for appellee.

DIXON, Chief Justice.

This was originally a garnishment suit filed by appellant David Asch against Amarillo Petroleum Building Co., Inc., et al., garnishee, in which garnishment suit First National Bank in Dallas intervened.

The subject of the dispute is the sum of $12,000 which will be due to Ramco Company, Inc., under the terms of a written contract Ramco Company has with Amarillo Petroleum Building Co., Inc., garnishee.

The case developed into a suit for a declaratory judgment to determine whether appellant Asch or intervenor First National Bank is entitled to the $12,000.

On June 29, 1956, following trial before the court without a jury, judgment was rendered in favor of First National Bank in Dallas.

### Facts

Some of the facts were stipulated by the parties. We here quote parts of the stipulation:

"A contract was made between Ramco Company, Inc. and David Asch on January 30, 1954 which involved a second contract which was contemplated that Asch was going to procure for Ramco. The second contract had to do with the architectural services and the drawing of plans for a building to be built in Amarillo, Texas by the Amarillo Petroleum Building Corporation or Company. The second contract between Ramco and the Amarillo Petroleum Building Company was executed on May 3rd, 1954. While the work was being performed by Ramco, some of the money was received by Ramco and at one point Ramco divided a portion of the funds with Asch under the Ramco-Asch contract. Later, when all of the architectural work was performed and the plans and specifications completed, Amarillo Petroleum Building Corporation was ready to pay the balance due under its agreement with Ramco. Approximately Twelve Thousand ($12,000.00) Dollars of that amount was held in escrow because of a controversy that arose between Ramco on the one hand and Asch and First National Bank on the other hand. This lawsuit involves the disagreement between Asch and the First National Bank only.

"The First National Bank claimed it was entitled to the Twelve Thousand ($12,-000.00) Dollars because of an assignment given to the Bank by Ramco of the contract between Ramco and the Amarillo Petroleum Building Corporation.

"Asch claimed that he was entitled to the Twelve Thousand ($12,000.00) Dollars because he had in his contract with Ramco the right to one-half of the profits from the Amarillo Petroleum Building Corporation-Ramco contract. The Twelve Thousand ($12,000.00) Dollars would have made up the balance due him for one-half of the profits. Asch was receiving one-half of the profits as consideration for having brought the Amarillo Petroleum Building Corporation contract to Ramco. * * * A contract for the design and construction of the building never materialized, but Ramco only obtained a contract for design of the building; that is, did not get the contract for construction of the building. * * * all of the money involved herein was paid in connection with the design of the building. * * * Asch at no time notified First National Bank of his contract with Ramco. * * * the Bank never received any notice of the contract between Asch and Ramco until the filing of this lawsuit and * * Asch had no knowledge of the financing methods used by Ramco with First National Bank. * * * It is further stipulated that Asch had no knowledge of the assignment which Ramco and McGarry gave the First National Bank and no notice thereof—such assignment was never put on record."

The relationship between appellant Asch and Ramco Company must be determined by the terms of the written contract dated January 30, 1954, entered into between them. We quote certain parts of the contract:

"Whereas, it is contemplated that Ramco will be employed as architect and builder of an office building to be located at 8th & Tyler Streets, in Amarillo, Texas, principally through the contacts and efforts of Asch while acting as an officer, director and stockholder of Ramco, and * * *

"Now, Therefore, it is mutually stipulated and agreed as follows:

"(1) Asch recognizes the proprietary right of Ramco to be named architect and builder in any contract that Asch may be instrumental in procuring with respect to said job. * * *

"(2) Upon the execution of said contract for construction of the above building in Amarillo, Texas, Asch shall devote as much of his time and professional services to Ramco as is reasonably necessary to properly complete said job in the most expeditious and economical manner. In this connection Asch shall not receive any compensation from Ramco for said job other than an interest in net profits on the job as set out in paragraph 3 below. * * *

"(3) If the contract for the Amarillo job referred to is procured in the name of Ramco, Ramco shall keep separate books and accounts with respect to said job. Asch and Ramco shall each receive fifty (50%) percent of the net profits from said job. Net profits for the purposes of this contract shall be computed after the Owner has made final payment to Ramco upon completion of the job. * * *."

We also quote certain parts of the assignment dated June 11, 1954 from Ramco Company to the Bank:

"Whereas, Ramco Company, Inc. hereinafter called 'Borrower' is indebted to First National Bank in Dallas, hereinafter called 'Bank,' upon a promissory note of even date herewith executed by Borrower payable to the Order of Bank in the principal sum of $20,000.00 * * * Now, Therefore, for a valuable consideration, receipt of which is hereby acknowledged, Borrower does hereby transfer, assign and deliver to Bank said receivables together with all amounts payable to Borrower by virtue of said receivables, such assignment being on the following terms and conditions: 1. This assignment shall secure (i) the note above described, (ii) all loans and advances which Bank may hereafter make to Borrower, (iii) all other indebtedness of every kind and character, whether now existing or hereafter arising, of Borrower to Bank * * *."

A copy of the executed contract between appellant Asch and Ramco Company dated January 30, 1954 was attached to the assignment.

We quote parts of the deposition of A. J. Kutner, Jr., Vice-President of the Bank:

"Q. Now, on June 11th, 1954, did you have any dealings with McGarry? A. Yes.

"Q. Would you describe, sir, what that transaction was? A. At that time he owed $20,000, and it consisted of three notes originally, and those notes were renewed from time to time in that general period.

"Q. All right, with reference to the notes in particular, how old were those notes, sir, at that time? A. There was a $10,000 loan made on November 2nd, 1953. That $10,000 note was renewed on February the 2nd, 1954, and again renewed on May the 4th, 1954. There was a $5,000 loan made December 16th, 1953. That was renewed on March 16th, '54, and again renewed on June 14th, 1954. There was a $5,000 loan made December 28th, 1953, renewed on March the 29th, 1954, and again on June the 28th in 1954. On August the 2nd, the $20,000 debt was combined into one note. * * *

"Q. Were those personal indebtednesses or were they indebtednesses of a company? A. They were the indebtedness of the company and he signed them individually.

"Q. So, he was signing for the company and himself? A. That is right.

"Q. What was the company's name, sir? A. Ramco. * * *

"Q. Now, on June the 11th, * * * did you request from McGarry an assignment of any collateral? A. Yes, sir.

"Q. I assume then, that is, those notes had been unsecured up until that time? A. That is right.

"Q. And he gave you collateral that day of June 11th, '54? A. That is right.

"Q. What was that collateral, sir? A. That was an assignment of the contract between the Ramco Company and the Amarillo Petroleum Building Corporation.

"Q. When did you first learn of that contract? A. I don't recall exactly, but I would say it was before the beginning of 1954, which was the time he began to talk about the Amarillo Contract job * * *

"Q. What was it that made you ask for an assignment of this contract at that time of June 11th or thereabouts? A. Well, these notes were coming up, and they were maturing, and we thought that we should have the assignment of the contract; *as a matter of fact, that was a consideration in renewing these notes, that we were to have the assignment of the contract.*

"Q. But you didn't actually renew any notes on that day? A. On June the 11th, no.

"Q. You didn't give him any new money on that day either, did you? A. No.

"Q. You renewed one $5,000 note on the 14th and one $5,000 note on the 28th, according to your statement, is that so, of June? A. That is correct. * * *

"Q. *Did you renew those notes on reliance of any particular factor or job that he was on at that time?* A. *Well, our consideration for renewal of those notes was that we were to get the assignment of the Amarillo Building job.*

"Q. *What about the second renewal that you made and you didn't require an assignment of contract at that time, for instance?* A. *Well, as I remember, Mr. McGarry was talking and working on this Amarillo Building contract as far back as the first of the year or possibly before the first of the year, and we knew that the contract was in the mill, and as these notes came up for renewal, there was one came up in March and one came up in February, we were renewing them with the under-standing that when his contract negotiations were completed, and the contract was firmed up, we would have the assignment.* * * *

"Q. The reason I asked, Mr. Kutner, I was noticing here that in February you made a renewal of $10,000 which was well in advance of the actual commencement of the contract between Amarillo and Ramco, and also on March 16th, you made a renewal of the $5,000 note and also on March 29th, you made a renewal of a $5,000 note; all of those, then, I take it, were on the basis that you were expecting at that time that he would get the contract? A. *That was our understanding, yes, that he had an excellent chance to get the contract, and that eventually it would be assigned to us.*" (Emphasis ours.)

In response to request, the trial court made and filed conclusions of law as follows:

"(1) Under the terms of the written contract executed on January 30, 1954, between plaintiff and The Ramco Company, Inc. (hereinafter called Ramco), wherein plaintiff was to receive fifty per cent (50%) of the net profits which Ramco was to receive from a contract to be entered into between Ramco and Amarillo Petroleum Building Company, Inc., plaintiff did not have or acquire any property right in such profits as a principal with Ramco, and was not an owner of such profits, or any part thereof, as a principal with Ramco. (2) Under the terms of such contract dated January 11, 1956, between plaintiff and Ramco, plaintiff had only a contractual right to have his compensation based upon a computation of the contemplated profits to be received by Ramco, and as thus computed, paid over to him when the profits were earned, and his interest in such profits was common with Ramco only because the profits were to serve as a measure of the compensation he would receive for his services. (3) Ramco was the sole owner of all right, title and interest of the funds accruing to Ramco thereunder in its con--

tract executed on May 3, 1954, with Amarillo Petroleum Building Company, Inc., and as such owner could assign the funds payable to it under such contract. (4) Because of the written assignment by Ramco on June 11, 1954, to Intervenor of the funds due Ramco under its contract of May 3, 1954, with Amarillo Petroleum Building Company, Inc., which assignment was prior in time to the institution of this garnishment suit, Intervenor, insofar as plaintiff was concerned, had the prior and superior right, title and interest to such funds due Ramco by Amarillo Petroleum Building Company, Inc., and which funds are involved in this garnishment suit."

## Opinion

In his first point on appeal appellant contends that the court erred in failing to hold that the $12,000 in question is the property of appellant because: "(a) Under the contract between appellant and Ramco, appellant was a joint venturer with reference to the building contract in question and the $12,000.00 represents a part of the profits of such joint venture belonging exclusively to appellant. (b) Ramco had no interest in or title to such $12,000.00 because it was appellant's property and Ramco could not assign or transfer property it did not own or control. (c) The right of appellant to such $12,000.00 was fixed by his contract of January 30, 1954 which was long before the attempted assignment to appellee Bank by Ramco of June 11, 1954. (d) An assignee has no better title than his assignor and here the assignor, Ramco, had no title to the $12,000.00 and could not convey the same to the assignee, appellee Bank."

We agree with the trial court that under the terms of the Asch-Ramco contract of January 30, 1954 there was no partnership or joint venture between Asch and Ramco. Asch under the terms of the contract did not acquire any property right in the profits of the Ramco-Amarillo contract of May 3, 1954. Certainly he did not

agree to share any losses, had there been losses instead of profits under the contract. Ramco was the owner of the Ramco-Amarillo contract and was authorized to make a valid and binding assignment of the proceeds of the contract to the Bank.

What then was the relationship between Asch and Ramco under the terms of their contract? We again agree with the trial court that appellant Asch had only a contractual right to have his compensation for services rendered based upon a computation of the contemplated profits to be received by Ramco—the profits serving only as a measure of the compensation appellant Asch would receive for his services.

The facts seem to us to support the above conclusions. In the contract Asch expressly recognizes that the right of Ramco to be named architect and builder in any contract Asch may be instrumental in procuring in respect to the Amarillo job was a proprietary right. Ramco thereafter executed the Amarillo contract in its own name with no mention of appellant Asch. A proprietary right denotes ownership. Turner v. Cross and Eddy, 83 Tex. 218, 18 S.W. 578, 15 L.R.A. 262; Trustees of New Castle Common v. Gordy, 33 Del.Ch. 334, 93 A.2d 509, 40 A.L.R.2d 544; Colten v. Jacques Marchais, Inc., Mun.Ct.N.Y., 61 N.Y.S.2d 269. Black's Law Dictionary, Third Ed., p. 1449, defines proprietary rights as follows: "Those rights which an owner of property has by virtue of his ownership."

Moreover, the contract expressly refers to the interest of Asch in the net profits as *compensation* for the Amarillo job. And the net profits were to be computed only after Amarillo had made final payment to Ramco.

In construing a contract, similar in many respects to the one now before us, in the case of McCord v. Fort Worth National Bank, Tex.Civ.App., 275 S.W.2d 717, at page 719, the Fort Worth Court of Civil Appeals said:

"* * * it seems clear to us that Mc-Cord was neither made a partner of Cauker nor a joint adventurer with him under this contract. * * * To our view, under this contract the ownership, or seizure, of the profits of the construction business as they accrued was not common because McCord did not have the right to dispose of any interest therein as an owner of an interest. He did not have the right to share in the profits of Cauker as a principal. Therefore, under the established rules of law in Texas he would be neither a partner nor a joint adventurer. Freeman v. Huttig Sash & Door Co., 1913, 105 Tex. 560, 153 S.W. 122, Ann.Cas.1916E, 446; Fink v. Brown, 1919, Tex.Com.App., 215 S.W. 846. We believe that McCord had only a contractual right to have his compensation based upon a computation of the profits and, as thus computed, paid over to him when it was earned, and his interest in such profits was common to Cauker's only because the profits were to serve as a measure of the compensation he would receive for his services. See the many cases and texts cited under Le Bus v. Le Bus, 1954, Tex. Civ.App., Fort Worth, 269 S.W.2d 506, 511. See 'Tests of Partnership', 68 C.J.S. Partnership § 20, p. 432 et seq." See also Strawn Nat. Bank v. Marchbanks, Tex.Civ. App., 74 S.W.2d 447, and Friedlander v. Hillcoat, Tex.Sup., 14 S.W. 786. We overrule appellant's first point on appeal.

In his second point appellant contends that the assignment from Ramco to the Bank was made without any consideration and is therefore invalid. In support of this contention appellant points out that on June 11, 1954 when the assignment was executed, the indebtedness of Ramco to the Bank was already in existence, and that on said date no note was renewed and no new money was loaned to Ramco.

We think appellant's second point is without merit for two reasons: (1) Appellant did not file any verified pleading in the trial court alleging failure of consideration, as required by Texas Rules of Civil Procedure, Rule 93(j); (2) the testimony of A. J. Kutner, Jr., as set out hereinbefore is sufficient to support a finding that there was in fact a valuable consideration in support of the assignment. Kutner testified that the Bank knew of the contemplated contract between Ramco and Amarillo, as early as January 1, 1954 or earlier, and that future renewals of Ramco's notes were to be made in consideration of the assignment of the contract after its execution. On June 28, 1954 a $5,000 note was again renewed, which note had already been renewed at least once, on March 29, 1954. On August 2, 1954 the three existing notes were combined into one $20,000 note. Appellant's second point on appeal is overruled.

The judgment of the trial court is affirmed.

## On Motion for Rehearing.

Our original opinion contains this statement: "Certainly he did not agree to share any losses, had there been losses instead of profits under the contract." Appellant says that we are in error because if appellant and appellee were engaged in a joint venture or partnership, as appellant contends, appellant would have been responsible for losses as a matter of law even in the absence of an express agreement that the partners would be liable for losses. 68 C.J.S. Partnership § 96, p. 536. Appellant says that our statement ignores this important principle of law, and instead tries to say that where no statement is made as to the sharing of losses, no partnership exists.

Appellant has mistakenly interpreted the quoted statement. It was not made as a conclusion of law, but as a statement of fact. It is a fact that the written contract entered into between appellant and appellee contains no provision as to sharing of losses by appellant. It is silent on that question. Such fact, though not conclusive, may be taken into consideration along with other evidentiary facts in determining whether the contractual relationship of the parties constituted a partnership.

In support of our holding we quote from one of the cases cited by appellant, Davis v. Gilmore, 244 S.W.2d 671, at pages 673, 674: "The absence of an express provision obligating the parties to share in the losses is also important and indicates that no partnership existed. Giddings v. Harding, Tex. Com.App., 267 S.W. 976; Paggi v. Quinn, Tex.Civ.App., 179 S.W.2d 789; Watson v. Edinburg Securities Company, Tex.Civ. App., 68 S.W.2d 644. But this feature too is not controlling. Bivins v. Proctor, 125 Tex. 137, 80 S.W.2d 307, Id., Tex.Civ. App., 49 S.W.2d 824; Sturdevant v. Hooper, Tex.Civ.App., 101 S.W.2d 379."

Appellant says that we were in error in citing Colten v. Jacques Marchais, Inc., Mun.Ct.N.Y., 61 N.Y.S.2d 269, because the holding in the Colten case is contrary to the later decision of Hochstadter v. H. Tarr, Inc., 188 Misc. 561, 68 N.Y.S.2d 762; and that in a still later case, Universal Map Co., Inc. v. Lutz & Sheinkman, 194 Misc. 938, 86 N.Y.S.2d 795, it is specifically stated that the Hochstadter case overruled the Colten case.

The Colten case was cited by us merely for its definition of the word proprietary. The case was overruled by later cases on other grounds. Nothing was said in the later cases cited by appellant about any error in the Colten case in regard to its definition of the word proprietary. We think the Colten case is still authority for the definition given.

The motion for rehearing is overruled.

On Second Motion for Rehearing.

In our original opinion we said: "A copy of the executed contract between appellant Asch and Ramco Company dated January 30, 1954 was attached to the assignment."

The above statement is incorrect. What we should have said and meant to say is: "A copy of the executed contract between Ramco Company and Amarillo Petroleum Building Company was attached to the assignment." Our opinion is hereby corrected accordingly.

With the above correction appellant's second motion for rehearing is overruled.