JACOB LEHRMAN,
Plaintiff-Appellant,

*vs.*

N. M. COHEN, ISRAEL COHEN, EMANUEL COHEN, LILLIAN COHEN SOLOMON, JOSEPH B. DANZANSKY and GIANT FOOD INC.,
Defendants-Appellees.

*Supreme Court, On Appeal, July 8, 1966.*

*John J. DeLuca* and *Joseph A. Julian, Jr.,* of DeLuca, Julian & Walsh, Wilmington, and *Milton S. Gould* and *William Schurtman,* of Shea, Gallop, Climenko & Gould, New York City, for plaintiff-appellant.

*Robert H. Richards, Jr.,* and *E. N. Carpenter, II,* of Richards, Layton & Finger, Wilmington, and *Paul R. Connolly, Merle Thorpe, Jr.,* and *Neal E. Sheldon,* of Hogan & Hartson, Washington, D. C., for defendants-appellees.

WOLCOTT, Chief Justice, and CAREY and HERRMANN, JJ., sitting.

HERRMANN, Justice. The primary problem presented on this appeal involves the applicability of the Delaware Voting Trust Statute.[1] Other questions involve the legality of stock having voting power but no dividend or liquidation rights except repayment of par value, and an alleged unlawful delegation of directorial duties and powers.

---

1. 8 *Del.C.* § 218 provides in part as follows:

"§ 218. Voting trusts

"(a) One or more stockholders may by agreement in writing deposit capital stock of an original issue with or transfer capital stock to any person or persons, or corporation or corporations authorized to act as trustee, for the purpose of vesting in such person or persons, corporation or corporations, who may be designated voting trustee or voting trustees, the right to vote thereon for any period of time determined by such agreement, not exceeding ten years, upon the terms and conditions stated in such agreement. Such agreement may contain any other lawful provisions not inconsistent with said purpose. After the filing of a copy of such agreement in the principal office of the corporation in the State of Delaware, which copy shall be open to the inspection of any stockholder of the corporation or any beneficiary of the trust under said agreement daily during business hours, certificates of stock shall be issued to the voting trustees to represent any stock of an original issue so deposited with them, and any certificates of stock so transferred to the voting trustees shall be surrendered and cancelled and new certificates therefor shall be issued to the voting trustees, and in the certificates so issued it shall appear that they are issued pursuant to such agreement, and in the entry of such voting trustees as owners of such stock in the proper books of the issuing corporation that fact shall also be noted. The voting trustees may vote upon the stock so issued or transferred during the period in such agreement specified. * * *."

These are the material facts:

Giant Food Inc. (hereinafter the "Company") was incorporated in Delaware in 1935 by the defendant N. M. Cohen and Samuel Lehrman, deceased father of the plaintiff Jacob Lehrman. From its inception, the Company was controlled by the Cohen and Lehrman families, each of which owned equal quantities of the voting stock, designated Class AC (held by the Cohen family) and Class AL (held by the Lehrman family) common stock. The two classes of stock have cumulative voting rights and each is entitled to elect two members of the Company's four-member board of directors.

Over the years, as may have been expected, there were differences of opinion between the Cohen and Lehrman families as to operating policies of the Company. Samuel Lehrman died in 1949; each of his children inherited part of his stock in the Company; but a dispute arose among the children regarding an *inter vivos* gift of certain shares made to the plaintiff by his father shortly before his death. To eliminate the Lehrman family dispute and its possible disruption of the affairs of the Company, an arrangement was made which settled the dispute and permitted the plaintiff to acquire all of the outstanding Class AL stock, thereby vesting in him voting power equal to that held by the Cohen family. The arrangement involved repurchase by the Company of the stock held by the plaintiff's brothers and sister, their relinquishment of any claim to the stock gift, and an equalizing surrender of certain stock by the Cohens to the Company for retirement. An essential part of the arrangement, upon the insistence of the Cohens, was the establishment of a fifth directorship to obviate the risk of deadlock which would have continued if the equal division of voting power between AL and AC stock were continued.

To implement the arrangement, on December 31, 1949, the Company's certificate of incorporation was amended, *inter alia,* to create a third class of voting stock, designated Class AD common stock, entitled to elect the fifth director. Article Fourth of the amendment to the certificate of incorporation provided for the issuance of one share of Class AD stock, having a par value of $10. and the following rights and powers:

> "The holder of Class AD common stock shall be entitled to all of the rights and privileges pertaining to common stock without any limitations, prohibitions, restrictions or qualifications

except that the holder of said Class AD stock shall not be entitled to receive any dividends declared and paid by the corporation, shall not be entitled to share in the distribution of assets of the corporation upon liquidation or dissolution either partial or final, except to the extent of the par value of said Class AD common stock, and in the election of Directors shall have the right to vote for and elect one of the five Directors hereinafter provided for.

"The corporation shall have the right, at any time, to re-, deem and call in the Class AD stock by paying to the holder thereof the par value of said stock, provided however, that such redemption or call shall be authorized and directed by the affirmative vote of four of the five Directors hereinafter provided for." [2]

By resolution of the board of directors, the share of Class AD stock was issued forthwith to the defendant Joseph B. Danzansky, who had served as counsel to the Company since 1944. All corporate action regarding the creation and the issuance of the Class AD stock was accomplished by the unanimous vote of the AC and AL stockholders and of the board of directors. In April 1950, pursuant to the arrangement, Danzansky voted his share of AD stock to elect himself as the Company's fifth director; and he served as such until the institution of this action in 1964. During that entire period, the AC and AL stock have been voted to elect two directors each. From 1950 through 1964, Danzansky regularly attended board meetings, raised and discussed general items of business, and voted on all issues as they came before the board. He was not obliged to break any deadlock among

---

2. Article Fourth of the amendment also co-related the Class AL and the Class AC stock as follows:

"The holders of Class AL common stock shall be entitled to all of the rights and privileges pertaining to common stock without any limitations, prohibitions, restrictions, or qualifications except that the holder or holders of said Class AL common stock, in the election of Directors, shall have the right to vote for and elect two of the five Directors hereinafter provided for.

"The holders of Class AC common stock shall be entitled to all of the rights and privileges pertaining to common stock without any limitations, prohibitions, restrictions, or qualifications except that the holder or holders of said Class AC common stock, in the election of Directors, shall have the right to vote for and elect two of the five Directors hereinafter provided for."

the directors prior to October 1, 1964 because no such deadlock arose before that date..

Beginning in December 1959, 200,000 shares of non-voting common stock of the Company were sold in a public issue for over $3,000,000. Each prospectus published in connection with the public issue contained the following statement:

"Common Stock AD is not a participating stock, and the only purpose for the provision and issuance of such stock is to prevent a deadlock in case the Directors elected by the Common Stock AC and the Directors elected by the Common Stock AL cannot reach an agreement."

Similarly, a letter on behalf of the Company to the Commissioner of Internal Revenue, dated July 15, 1959, contained the following statement:

"As can be seen from the enclosed certified copy of the stock provisions of the certificate of Incorporation, as amended, the Class AD common stock is not a participating stock, the only purpose for the provision and issuance of such a stock being to prevent a deadlock in case the AC and AL Directors cannot reach an agreement."

From the outset and until October 1, 1964, the defendant N. M. Cohen was president of the Company. On that date, a resolution was adopted at the Company's annual stockholders' meeting to give Danzansky a fifteen year executive employment contract at an annual salary of $67,600., and options for 25,000 shares of the non-voting common stock of the Company. The AC and AD stock were voted in favor and the AL stock was voted against the resolution. At a directors meeting held the same day, Danzansky was elected president of the Company by a 3-2 vote, the two AL directors voting in opposition. On December 11, 1964, Danzansky resigned as director and voted his share of AD stock to elect as the fifth director, Millard F. West, Jr., a former AL director and investment banker whose firm was one of the underwriters of the public issue of the Company's stock. The newly constituted board ratified the election of Danzansky as president; and, on January 27, 1965, after the commencement of this action and after a review and report by a committee consisting of

the new AD director and one AL director, Danzansky's employment contract was approved and adopted with certain modifications.

The plaintiff brought this action on December 11, 1964, basing it upon two claims: The First Claim charges that the creation, issuance, and voting of the one share of Class AD stock resulted in an arrangement illegal under the law of this State for the reasons hereinafter set forth. The Second Claim, addressed to the events of October 1, 1964, charges that the election of Danzansky as president of the Company and his employment contract violated the terms of the 1959 deadlock-breaking arrangement, as made between the holders of the AC and AL stock, and constituted breaches of contract and fiduciary duty. The plaintiff and the defendants filed cross-motions for summary judgment as to the First Claim. The Court of Chancery, after considering the contentions now before us and discussed *infra,* granted summary judgment in favor of the defendants and denied the plaintiff's motion for summary judgment. The plaintiff appeals.

## I.

The plaintiff's primary contention is that the Class AD stock arrangement is, in substance and effect, a voting trust; that, as such, it is illegal because not limited to a ten year period as required by the Voting Trust Statute. The defendants deny that the AD stock arrangement constitutes a disguised voting trust; but they concede that if it is, the arrangement is illegal for violation of the Statute. Thus, issue is clearly joined on the point.

■ The criteria of a voting trust under our decisions have been summarized by this Court in *Abercrombie v. Davies,* 36 *Del.Ch.* 371, 130 *A.2d* 338 (1957). The tests there set forth, accepted by both sides of this cause as being applicable,[3] are as follows: (1) the voting

3. While the tests and criteria set forth in the *Abercrombie* case prevail, its facts are entirely different. There, several stockholders, each representing a minority interest, agreed to place their stock in escrow for a period of ten years, in exchange for stock receipts, for the purpose of acquiring voting control of the corporation. Agents were appointed and, by irrevocable proxies, the agents were given joint and several voting rights and sole power of decision; no stockholder retained the right to vote his own stock. On those facts, an attempt having been thus made to separate the vote from the stock, this Court held that the stockholders had created a voting trust subject to the controls and limitations of § 218.

rights of the stock are separated from the other attributes of owner-ship; (2) the voting rights granted are intended to be irrevocable for a definite period of time; and (3) the principal purpose[4] of the grant of voting rights is to acquire voting control of the corporation.

Adopting and applying these tests, the plaintiff says, as to the first element, that the AD arrangement provides for a divorcement of voting rights from beneficial ownership of the AC and AL stock; that the creation and issuance of the share of AD stock is tantamount to a pooling by the AC and AL stockholders of a portion of their voting stock and giving it to a trustee, in the person of the AD stockholder, to vote for the election of the fifth director; that after the creation of the AD stock, the AC and AL stockholders each hold but 40% of the voting power, and the AD stockholder holds the controlling balance of 20%; that the AD stock has no property rights except the right to a return of the $10. paid as the par value; and that, therefore, there has been a transfer of the voting rights devoid of any participating property rights. So runs the argument of the plaintiff in support of his contention that the first of the *Abercrombie* criteria for a voting trust is met.

■ The contention is unacceptable. The AD arrangement did not separate the voting rights of the AC or the AL stock from the other attributes of ownership of those classes of stock. Each AC and AL stockholder retains complete control over the voting of his stock; each can vote his stock directly; no AL or AC stockholder is divested of his right to vote his stock as he sees fit; no AL or AC stock can be voted against the shareholder's wishes; and the AL and AC stock continued to elect two directors each.

■ The AD stock arrangement, as we view it, became a part of the capitalization of the Company. The fact that there is but a single share, or that the par value is nominal, is of no legal significance; the one share and the $10. par value might have been multiplied many times over, with the same consequence. It is true that the creation of the separate class of AD stock may have diluted the voting *power* which had previously existed in the AC and AL stock—the usual

4. It is noteworthy, in this connection, that in *Abercrombie,* this Court dis-tinguished between purpose and motive, stating that it considered only purpose to be material (130 *A.2d 338, 341*).

consequence when additional voting stock is created—but the creation of the new class did not divest and separate the voting *rights* which remain vested in each AC and AL shareholder, together with the other attributes of the ownership of that stock. The fallacy of the plaintiff's position lies in his premise that since the voting power of the AC and AL stock was reduced by the creation of the AD stock, the percentage of reduction became the *res* of a voting trust. In any recapitalization involving the creation of additional voting stock, the voting power of the previously existing stock is diminished; but a voting trust is not necessarily the result.

Since the holders of the Class AC and Class AL stock of the Company did not separate the voting rights from the other attributes of ownership of those classes when they created the Class AD stock, the first *Abercrombie* test of a voting trust is not met.

This conclusion disposes of the second and third *Abercrombie* tests, i.e., that the voting rights granted are irrevocable for a definite period of time, and that the principal object of the grant of voting rights is voting control of the corporation. Having held that the AC and AL stockholders have not divested themselves of their voting rights, although they may have diluted their voting powers, we do not reach the remaining *Abercrombie* tests, both of which assume the divestiture of voting rights.

██ In the final analysis, the essence of the question raised by the plaintiff in this connection is this: Is the substance and purpose of the AD stock arrangement sufficiently close to the substance and purpose of § 218 to warrant its being subjected to the restrictions and conditions imposed by that Statute? The answer is negative not only for the reasons above stated, but also because § 218 regulates trusts and pooling agreements amounting to trusts, not other and different types of arrangements and undertakings possible among stockholders. Compare *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Ringling*, 29 *Del.Ch.* 610, 53 *A.2d* 441 (1947); *Abercrombie v. Davies, supra*. The AD stock arrangement is neither a trust nor a pooling agreement. See 5 *Fletcher Cyclopedia Corporations (Perm. Ed.)* § 2077.

We hold, therefore, that the Class AD stock arrangement is not controlled by the Voting Trust Statute.

## II.

The plaintiff's second point is that even if the Class AD stock arrangement is not a voting trust in substance and effect, the AD stock is illegal, nevertheless, because the creation of a class of stock having voting rights only, and lacking any substantial participating proprietary interest in the corporation, violates the public policy of this State as declared in § 218.

The fallacy of this argument is twofold: First, it is more accurate to say that what the law has disfavored, and what the public policy underlying the Voting Trust Statute means to control, is the separation of the vote from the stock—not from the stock ownership. 5 *Fletcher Cyclopedia Corporations,* § 2080, pp. 363-369; compare *Abercrombie v. Davies, supra.* Clearly, the AD stock arrangement is not violative of that public policy. Secondly, there is nothing in § 218, either expressed or implied, which requires that all stock of a Delaware corporation must have both voting rights and proprietary interests. Indeed, public policy to the contrary seems clearly expressed by 8 *Del.C.* § 151(a)[5] which authorizes, in very broad terms, such voting powers and participating rights as may be stated in the certificate of incorporation. Non-voting stock is specifically authorized by § 151(a); and in the light thereof, consistency does not permit the conclusion, urged by the plaintiff, that the present public policy of this State condemns the separation of voting rights from beneficial stock ownership. Compare 1 *Hornstein Corporation Law and Practice,* § 211 (1959); 5 *Fletcher Cyclopedia Corporations (Perm.Ed.)* § 2080, pp. 363-369; *Anno.* 105 *A.L.R.* 123, 127; 13 *Am.Jur.* "*Corporations*" § 504.

---

5. 8 *Del.C.* § 151(a) provides:

"§ 151. Classes and series of stock; rights, etc.

"(a) Every corporation may issue one or more classes of stock or one or more series of stock within any class thereof, any or all of which classes may be of stock with par value or stock without par value, with such voting powers, full or limited, or without voting powers and in such series and with such designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, as shall be stated and expressed in the certificate of incorporation or of any amendment thereto, or in the resolution or resolutions providing for the issue of such stock adopted by the board of directors pursuant to authority expressly vested in it by the provisions of the certificate of incorporation or of any amendment thereto. * * *."

██ ██ We conclude that the plaintiff's contention in this regard cannot withstand the force and effect of § 151(a). In our view, that Statute permits the creation of stock having voting rights only, as well as stock having property rights only. The voting powers and the participating rights of the Class AD stock being specified in the Company's certificate of incorporation, we are of the opinion that the Class AD stock is legal by virtue of § 151(a).

\* \* \*

We are told that if the AD stock arrangement is allowed thus to stand, our Voting Trust Statute will become a "dead letter" because it will be possible to evade and circumvent· its purpose simply by issuing a class of non-participating voting stock, as was done here. We have three negative reactions to this argument:

 First, it presupposes a divestiture of the voting rights of the AC and AL stock—an untenable supposition as has been stated. Secondly, it fails to take into account the main purpose of a Voting Trust Statute: to avoid secret, uncontrolled combinations of stockholders formed to acquire voting control of the corporation to the possible detriment of non-participating shareholders.[6] Compare 5 *Fletcher Cyclopedia Corporations (Perm.Ed.)* § 2080, pp. 367-368; § 2080, 1, p. 372. It may not be said that the AD stock arrangement contravenes that purpose. Finally on this point, if we misconceive the legislative intent, and if the AD stock arrangement in this case reveals a loophole in § 218 which should be plugged, it is for the General Assembly to accomplish—not for us to attempt by interstitial judicial legislation.

## III.

 The plaintiff advances yet another reason for invalidating the AD stock. The essence of this argument is that the only function of that class of stock is to break directorial deadlocks; that the issuance of the AD stock is merely a technical device to permit that re-

---

6. In this connection, it is noteworthy·that in the case of *In re Morse,* 247 *N.Y.* 290, 160 *N.E.* 374, which was influential in our leading case of *Perry v. Missouri-Kansas Pipe Line Co.,* 22 *Del.Ch.* 33, 191 *A.* 823 (1937), the New York Statute provided that every stockholder was privileged to join in any voting trust agreement; and the Court held that a trust agreement excluding any stockholder was invalid because obnoxious to that requirement.

sult; that, as such, it is illegal because it permits the AC and AL directors of the Company to delegate their statutory duties to the AD director as an arbitrator.

We see nothing inherently wrong or contrary to the public policy of this State, as plaintiff seems to suggest, about a device, otherwise lawful, designed by the stockholders of a corporation to break deadlocks of directors. The plaintiff says in this connection, that if public policy sanctioned such devise, our General Corporation Law would provide for it. The fallacy of this argument lies in the assumption that legislative silence is a dependable indicator of public policy. See *Perry v. Missouri-Kansas Pipe Line Co., supra;* 5 *Fletcher Cyclopedia Corporations (Perm.Ed.)* § 2080. We know of no reason, either under our statutes or our decisions, which would prevent the stockholders of a Delaware corporation from protecting themselves and their corporation, by a plan otherwise lawful, against the paralyzing and often fatal consequences of a stalemate in the directorate of the corporation. We hold, therefore, that the AD stock arrangement had a proper purpose.

As to the means adopted for the accomplishment of that purpose, we find the AD stock arrangement valid by virtue of § 141 (*a*) of the Delaware Corporation Law which provides:

"The business of every corporation organized under the provisions of this chapter shall be managed by a board of directors, except as hereinafter or in its certificate of incorporation otherwise provided."

The AD stock arrangement was created by the unanimous action of the stockholders of the Company by amendment to the certificate of incorporation. The stockholders thereby provided how the business of the corporation is to be managed, as is their privilege and right under § 141(*a*). It was this stockholder action which delegated to the AD director whatever powers and duties he possesses; they were not delegated to him by his fellow directors, either out of their own powers and duties, or otherwise.

It is settled, of course, as a general principle, that directors may not delegate their duty to manage the corporate enterprise. *Adams v. Clearance Corporation,* 35 *Del.* 459, 121 *A.2d* 302

(1956). But there is no conflict with that principle where, as here, the delegation of duty, if any, is made not by the directors but by stockholder action under § 141(a), via the certificate of incorporation.

In our judgment, therefore, the AD stock arrangement is not invalid on the ground that it permits the AC and AL directors of the Company to delegate their statutory duties to the AD director.

On this point, the plaintiff relies mainly upon the Chancery Court decision in *Abercrombie v. Davies,* 35 *Del.Ch.* 599, 611, 123 *A.2d* 893 (1956). There, in considering an agreement requiring all eight directors to submit a disputed question to an arbitrator if seven were unable to agree, the Chancery Court stated that legal sanction may not be accorded to an agreement, at least when made by less than all the stockholders, which takes from the board of directors the power of determining substantial management policy. The plaintiff's reliance is misplaced, because, *inter alia,* the *Abercrombie* arrangement was not created by the certificate of incorporation, within the authority of § 141(a). The plaintiff also relies in this connection upon *Field v. Carlisle Corp.,* 31 *Del.Ch.* 227, 68 A.2d 817 (1949) and *Adams v. Clearance Corp.,* 35 *Del.Ch.* 459, 121 *A.2d* 302 (1956). The *Field* case is not in point because it involved delegation of authority by the directors themselves, rather than, as here, by the stockholders speaking through the certificate of incorporation. The *Adams* case is of no aid to the plaintiff's position because there, too, the certificate of incorporation was not involved in the delegation of directorial duties asserted. Finally, the plaintiff relies upon *Sterling Industries, Inc. v. Ball Bearing Pen Corp.,* 298 *N.Y.* 483, 84 *N.E.2d* 790, 10 *A.L.R.2d* 694 (1949) and 7 *White, New York Corporations,* ¶ 8.18 (1953). The New York authorities, uncontrolled by § 141(a), are inapposite.

\* \* \*

Our conclusions upon these questions make it unnecessary to discuss the defendants' contentions that the plaintiff's action is barred by the principles of estoppel, laches, acquiescence and ratification.

Finding no error in the judgment below, it is affirmed.