(No. 42902.—

DONALD L. STROH *et al.,* Appellants, *vs.* BLACKHAWK HOLDING CORPORATION *et al.,* Appellees.

*Opinion filed May 21, 1971.*

472

RYAN, J., took no part.
SCHAEFER and WARD, JJ., dissenting.

FROEHLING & TAYLOR, of Canton, and BISHOP AND CRAWFORD, of Chicago, (RALPH FROEHLING and J. STEPHEN CRAWFORD, of counsel,) for appellants.

MITCHELL AND RUSSELL, of Chicago, (THOMAS J. RUSSELL, WILLIAM H. KELLY, JR., MILLS & RONCONE, GERALD W. SHEA, and RICHARD C. RIPPLE, of counsel,) for appellees.

Mr. JUSTICE DAVIS delivered the opinion of the court:

Count I of the plaintiffs' three-count complaint alleged that the Class B shares of stock issued by the defendant, Blackhawk Holding Corporation, were not valid shares of

corporate capital stock in that their principal attribute consisted solely of the right to vote. The circuit court of Hancock County granted the plaintiffs' motion for summary judgment on count I and held that the Class B shares did not constitute shares of stock; that their issuance by the corporation was an invalid, *ultra vires* act; and was void *ab initio*. The trial court granted other incidental relief and expressly found no reason for delaying the enforcement or appeal of its decree.

The appellate court (117 Ill. App. 2d 301) reversed and remanded the judgment of the circuit court, and held that the shares of stock in question were valid. We allowed the plaintiffs' petition for leave to appeal.

The only issue before this court is the validity of the 500,000 shares of Class B stock, which by the articles of incorporation of Blackhawk were limited in their rights by the provision "none of the shares of Class B stock shall be entitled to dividends either upon voluntary or involuntary liquidation or otherwise." It is the plaintiffs' contention that because of the foregoing limitation—depriving the Class B shares of the "economic" incidents of shares of stock, or of the proportionate interest in the corporate assets—the Class B shares do not in fact constitute shares of stock.

Blackhawk Holding Corporation was organized under the Illinois Business Corporation Act in November of 1963. Its articles of incorporation authorized the issuance of 3,000,000 shares of Class A stock with a par value of $1, and 500,000 shares of Class B stock without par value. In addition to the limitation placed on the Class B stock, set forth above, the articles also provided that neither the Class A nor Class B shares would carry preemptive rights. Pursuant to the preorganization subscription agreements, 21 promoters purchased 87,868 shares of the Class A stock at the price of $3.40 per share ($298,751.20), and the 500,000 shares of Class B stock at ¼¢ per share ($1,250).

Thereafter, the corporation registered the Class A shares with the securities division of the office of the Secretary of State of Illinois for the sale of 500,000 shares thereof to the general public at a price of $4 per share. The prospectus for the registration described the Class A and Class B stock, and quoted from the articles of incorporation relative to their respective rights and preferences. The prospectus explained that every share of each class of stock would be entitled to one vote on all general matters submitted to a vote of the shareholders and, that in the election of directors, the votes could be cumulated. The prospectus also explained that no Class B stock was being offered for sale in that all of such stock has been previously issued. Under the heading "Organization and Development," the prospectus also stated: "Subscriptions for a total of $300,001.20 were sold to twenty-one persons, representing 87,868 class A shares, the class now being offered, at the price of $3.40 per share ($298,751.20) and 500,000 class B shares, at a price of one-fourth of a cent per share ($1,250.00) ; thus said subscribers by virtue of a $300,001.20 investment, have control of the corporation having an initial capitalization of $2,000,000.00 after this offering."

In August of 1964, there was a 2 for 1 split of the Class A stock, increasing the shares outstanding from 587,863 to 1,175,736 shares. The corporation sold additional Class A stock to the public in 1965 for $4 a share. As of June 1968, there were 1,237,681 Class A shares and 500,000 Class B shares outstanding, the latter representing 28.78% of the total voting shares of the company.

A corporation is a creature of statute. (*Craig* v. *Sullivan Machinery Co.*, 344 Ill. 334, 336.) It is a legal entity which owes its existence to the fiat of law. Its being and powers are from the sovereign State as its will is expressed through legislative enactment. (*Chicago Title and Trust Co.* v. *Central Republic Trust Co.*, 299 Ill. App. 483, 492.) The articles of incorporation of an Illinois corporation con-

stitute a contract, threefold in nature. It is a contract between the corporation and the State and it creates powers and limitations, rights and duties as between the corporation and its shareholders, as well as between the shareholders themselves. The powers and limitations of a corporation are found in its articles of incorporation, the provisions of its stock certificates, its by-laws, and in the constitutional and statutory provisions in force when the articles of incorporation were adopted. (*Bowman* v. *Armour and Co.,* 17 Ill.2d 43, 47; *Western Foundry Co.* v. *Wicker,* 403 Ill. 260, 267, 268; *Kreicker* v. *Naylor Pipe Co.,* 374 Ill. 364, 371.) The articles of incorporation of Blackhawk purport to create a Class B stock that possesses no rights in the assets or in the earnings of the corporation. Whether this can be done, and whether such shares have the requisite attributes of a valid share of stock, must be determined in accordance with the constitution of the State, the provision of the Business Corporation Act, and the common law of the State.

Under the Illinois constitution of 1870, a stockholder in an Illinois corporation is guaranteed the right to vote based upon the number of shares owned by him. (Ill. Const. art. XI, sec. 3.) Section 14 of the Business Corporation Act (Ill. Rev. Stat. 1969, ch. 32, par. 157.14) provides that shares of stock in an Illinois corporation may be divided into classes,

"with such designations, preferences, qualifications, limitations, restrictions and such special or relative rights as shall be stated in the articles of incorporation. The articles of incorporation shall not limit or deny the voting power of the shares of any class.

Without limiting the authority herein contained, a corporation when so provided in its articles of incorporation, may issue shares of preferred or special classes:

* * *

(c) Having preference over any other class or classes of shares as to the payment of dividends.

(d) Having preference as to the assets of the corporation over any other class or classes of shares upon the voluntary or involuntary liquidation of the corporation."

Section 41 of the Act, relating to the power of the board of directors to declare dividends, provides that no dividends may be declared or paid contrary to any restrictions in the articles of incorporation. Ill. Rev. Stat. 1969, ch. 32, par. 157.41(h).

Section 2.6 of the Act, in defining "shares" states, " 'Shares' means the units into which the proprietary interests in a corporation are divided." (Ill. Rev. Stat. 1969, ch. 32, par. 157.2—6.) This was formerly section 2(f) of the Act (Ill. Rev. Stat. 1955, ch. 32, par. 157.2(f)) which defined shares as "units into which shareholders' rights to participate in the control of a corporation, in its surplus or profits, or in the distribution of its assets, are divided." Committee Comment, relative to the change in definition by the 1957 amendment, is that it was made to enact the definition of the Model Business Corporation Act, "but there was no change in legal effect." 1 Ill. Bus. Corp. Act Anno., 2d ed., 1966 poc. supp. p. 5, § 2.6 comment.

To the plaintiffs, "proprietary," as used in the definition of shares, means a property right, and shares must then represent some economic interest, or interest in the property or assets of the corporation. However, the word "proprietary" does not necessarily denote economic or asset rights, although it has been defined as synonymous with ownership or to denote legal title (*Evans* v. *United States,* 251 F. Supp. 296, 300; *Asch* v. *First National Bank in Dallas* (Tex.), 304 S.W.2d 179, 183; The American Heritage Dictionary of the English Language (1969)), and "proprietary rights" have been defined as those conferred by virtue of ownership of a thing (*Colten* v. *Jacques Marchais, Inc.,* 61

N.Y.S.2d 269, 271; *Black's Law Dictionary*, 4th Ed. Rev., 1968). In *Colten*, the court defined "proprietary" as meaning ownership, exclusive title or dominion, and implying possession and physical control of a thing.

In *Millar* v. *Mountcastle*, 161 Ohio St. 409, 119 N.E.2d 626, 632, the Supreme Court of the State of Ohio discussed the meaning of ownership as represented by holding shares of stock. The court said that by reason of ownership of a share of corporate stock, one becomes the owner of intangible property comprised of various relationships which are determined by the terms of the stock certificate, the articles of incorporation, and the internal regulations of the corporation, and the statutes and common law of the State of incorporation. The court stated that the ownership comprising the relationship might include "one or more" of several specified rights, including the right to vote.

The meaning of ownership may vary depending upon the subject matter of the ownership, the place of the ownership, and any particular restraints placed thereon by contract or law. Both the plaintiffs and the defendants stress that section 2.6 of the Business Corporation Act, in defining shares in terms of a proprietary interest, did not change the prior statutory definition of shares as the "right to participate in the control of the corporation, in its surplus or profits, or in the distribution of its assets." Both parties find comfort in the grammatical construction of the prior definition.

We agree with the defendants' construction. We interpret this statutory definition to mean that the proprietary rights conferred by the ownership of stock may consist of one or more of the rights to participate "in the control of the corporation, in its surplus or profits, *or* in the distribution of its assets." The use of the disjunctive conjunction *"or,"* indicates that one or more of the three named rights may inure to a stockholder by virtue of his stock ownership. A series of phrases in the disjunctive does

not require that each phrase be separated by the word "or," as the plaintiffs suggest; more commonly and correctly each phrase except the last is preceded only by a comma, and the last is preceded by the word "or." The absence of the disjunctive "or" preceding the phrase "in its surplus or profit," is too thin a reed to support the construction urged by the plaintiffs. The phrases in the series represent alternatives. (*People* v. *Vraniak,* 5 Ill.2d, 384, 389; *Central Standard Life Insurance Co.* v. *Davis,* 10 Ill. App. 2d 245, 254, 255), and we so construe them. This conclusion, however, is not dispositive of this litigation.

We must here decide the extent to which economic attributes of shares of stock may be eliminated. This must be determined from the intent of the legislature which, in no small part, can be gathered from the language and words it chose to express that intent. The statutory definition of "shares" is of particular importance in that it governs the meaning of the word as used throughout the Business Corporation Act and controls in its construction. The legislature has the power to make any reasonable definition of the terms in a statute and such definition for the purposes of the Act, will be sustained. *Modern Dairy Co.* v. *Department of Revenue,* 413 Ill. 55, 66.

Section 14 of the Act clearly expresses the intent of the legislature to be that parties to a corporate entity may create whatever restrictions and limitations they may want with regard to their corporate stock by expressing such restrictions and limitations in the articles of incorporation. These rights and powers granted by the legislature to the corporation to make the terms of its contract with its shareholders are limited only by the proviso that the articles may not limit or deny the voting power of any share. This section of the Act expressly confers the right to prefer a class of shares over another with regard to dividends and assets. Section 2.6 defines shares as "The units into which the proprietary interests in a corporation are divided."

In seeking the intent of the legislature, a statute should be construed as a whole and its separate parts considered together. Our present constitution requires only that a shareholder not be deprived of his voice in management. It does not require that a shareholder, in addition to the management aspect of ownership, must also have an economic interest.

Thus, section 14, like the constitution, limits the power of a corporation only as to the voting aspect of ownership. It confers upon the corporation the "power to create and issue the number of shares stated in its article of incorporation"; it expressly permits the shares to be subject to "such designations, preferences, qualifications, limitations, restrictions, and such special or relative rights as shall be stated in the articles of incorporation"; it also suggests that "Without limiting the authority herein contained, a corporation, when so provided in its articles of incorporation, may issue shares of preferred or special classes," which classes are delineated therein.

Section 41 of the Act recognizes that while the power to declare dividends with respect to shares is in the board of directors, this power is limited, among other things, by any restrictions in the articles of incorporation.

When the relevant sections of the Act are read together with the constitution, it seems apparent that it was the intent of the legislature that the proprietary interests represented by the shares of stock consist of management or control rights, rights to earnings, and rights to assets. There are other rights which are incidental to these. Under our laws, the rights to earnings and the rights to assets—the "economic" rights—may be removed and eliminated from the other attributes of a share of stock. Only the management incident of ownership may not be removed.

While we have found no Illinois case in which this precise issue was raised, the Supreme Court of Delaware in *Lehrman v. Cohen*, 43 Del. Ch. 222, 222 A.2d 800, had be-

fore it a case involving a similar issue. In *Lehrman* the corporation was controlled and run by two families, each owning one-half of the voting stock. It was agreed that a fifth directorship should be created on the board to break any deadlock. An additional class of stock was created for the issuance of one share having the right to vote for and elect one of the five directors. This stock was not entitled to share in any of the dividends or the assets upon liquidation or dissolution. It was issued for the $10 par value.

The court rejected the argument that the corporation had created a voting trust through this device and then addressed itself to the contention that this stock was illegal, in violation of the public policy of the State, because it had voting rights only, and no "substantial participating propriety interest in the corporation." In rejecting this argument the court said that the public policy seemed clearly to the contrary, and cited 4 Del. Code Anno., Title 8, § 151(a), which, in part, states: "Every corporation may issue one or more classes of stock * * * and with such designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations' or restrictions thereof, as shall be stated and expressed in the certificate of incorporation." The court concluded that the statute in question permitted the creation of stock having voting rights only, as well as stock having property rights only.

It is true that the court addressed itself primarily to the relationship of the stock to a voting trust and emphasized that nonvoting stock was permitted under the statute. However, the court recognized that the statute in question, strikingly similar to section 14 of our Act, authorizes in broad terms such participating rights as might be stated in the certificate of incorporation. (*Lehrman* v. *N. M. Cohen*, 222A.2d 800, 807.) It concluded that the statute permitted stock having voting rights only. The only difference is that in our State, because of our constitutional limitation, and

the statutory implementation thereof, we may not have shares of stock possessing only property rights.

The plaintiffs have cited numerous text references and cases which discuss the characteristics of shares of stock. These refer to the attributes commonly attendant to a share of stock. (*E.g., Bowman* v. *Armour and Co.,* 17 Ill.2d 43, 51; *Central Illinois Public Service Co.* v. *Swartz,* 284 Ill. 108; *Consolidated Coal Co.* v. *Miller,* 236 Ill. 149; 11 Fletcher Cyc. Corp. (Perm. Ed.), secs. 5083, 5100; 18 Am. Jur. 2d, Corporations, sec. 209; 13 I.L.P., Corporations, sec. 82.) These citations deal with the attributes of shares generally and are not significant to our determination. We are not called upon to determine the common characteristics of a share of stock absent any particular restrictions in the articles of incorporation. We are called upon to determine whether certain of the common attributes of a share may be eliminated.

Interestingly, this court in *Bowman,* at page 51, stated that a share of stock entitles the shareholder to an aliquot part of the property or its proceeds "to the extent indicated." Likewise, in *Gidwitz* v. *Lanzit Corrugated Box Co.,* 20 Ill.2d 208, 215, we said: "The essential attribute of a shareholder in a corporation is that he is entitled to participate, according to the amount of his stock, in the selection of the management of the corporation, and he cannot be deprived or deprive himself of that power." But, the question there before the court was not the same as in this case, and the statement there does not require the conclusion that the voting right is the only essential attribute of a share any more than the cases the plaintiffs cite require us to find that all three attributes—voting rights and dividend rights, and rights to the assets—are the essential attributes of a share of stock.

The plaintiffs have referred us to a number of cases holding that voting rights may not be separated from a share of stock of a corporation. We are of the opinion that

the Class B shares are valid shares of stock, and that the right to vote which they possess is not a separation of the voting rights from the ownership of the corporate shares.

The constitution requires only that the right to vote be proportionate to the number of shares owned, not to the investment made in a corporation. It has long been the common practice in Illinois to classify shares of stock such that one may invest less than another in a corporation, and yet have control. One of two shareholders may purchase ten shares of a class of stock issued at its par value of $1,000 per share, and his business partner may purchase 100 shares of another class of the corporate stock issued at its par value of $10 per share. The parties, for varying reasons, may be very willing that the party investing the $1,000 have control of the management of the corporation, as opposed to the party having the investment of $10,000. See: Hoban, Voting Control Methods, 1958 Ill. Law. For. 111-113.

If there is overreaching or fraud in establishing the different relative voting rights of shares, that is another matter and there is a remedy available. We are aware that the classification of shares, so as to enable one class to obtain greater voting rights with the same or lesser investment in a corporation than another class, may carry with it the possibility for wrongdoing. However, it also often serves a valid purpose and there is nothing inherently wrong in such a scheme. The fact that a corporation makes a public offering of stock does not render the procedure outlined above less valid. The securities division of the Secretary of State's office has its particular guidelines to protect the public in such an offering.

In this case the parties went one step further than is customary. The stock which could be bought cheaper, and yet carry the same voting power per share, was not permitted to share at all in the dividends or assets of the corporation. This additional step did not invalidate the stock.

We find nothing in the declared public policy of this State to condemn stock of this nature. Indeed, the constitution and Business Corporation Act evidence a public policy of only prohibiting the removal of voting rights from the normal attributes of shares of stock. In *Wall v. Pfanschmidt,* 265 Ill. 180, at page 192, we stated: "This court has repeatedly held, in line with the general rule in other jurisdictions, that the public policy of a State must be sought in its constitution, legislative enactments and judicial decisions. [Citation.] In *Collins* v. *Metropolitan Life Ins. Co., supra,* [232 Ill. 37] we said (p. 44) : 'When the sovereign power of the State has by written constitution declared the public policy of the State on a particular subject, the legislative and judicial departments of the government must accept such declaration as final. When the legislature has declared, by law, the public policy of the State the judicial department must remain silent, and if a modification or change in such policy is desired the law-making department must be applied to and not the judiciary, whose function is to declare the law but not to make it.' " And in *Schumann-Heink* v. *Folsom,* 328 Ill. 321, at page 330, we stated: "In considering whether any contract is against public policy it should be remembered that it is to the interests of the public that persons should not be unnecessarily restricted in their freedom to make their own contracts. Agreements are not held to be void, as being contrary to public policy, unless they be clearly contrary to what the constitution, the statutes or the decisions of the courts have declared to be the public policy or unless they be manifestly injurious to the public welfare."

In the area of public policy we must consider that all requirements of the securities division of the office of Secretary of State of Illinois have been fully met in connection with the registration of the Class A stock of the corporation for sale to the public, including the stipulation that the Class B stock be less than $\frac{1}{3}$ of the total number of shares

outstanding after the public offering and that the promoters have at least a 15% equity interest of their own funds in the corporation. This action cannot but reflect the policy of the State with respect to stocks, such as the Class B stock in question. It appears to permit its issuance, but to restrict its amount in order to protect investors.

We have assumed, without deciding, for the purpose of this decision only, that the Class B stock carried with it no rights to dividends, current or liquidating. In the light of the views expressed herein, the judgment of the appellate court is affirmed and the cause is remanded to the circuit court with directions to vacate the final decree entered in this cause finding the Class B shares of Black-hawk Holding Corporation to be invalid, and to proceed with the determination of this cause in accordance with the views expressed herein.

*Affirmed and remanded,
with directions.*

Mr. JUSTICE RYAN took no part in the consideration or decision of this case.

Mr. JUSTICE SCHAEFER, dissenting:

The last paragraph of the majority opinion is hard to understand. It seems to render meaningless all of the discussion that precedes it. This case is concerned with the Class B stock of Blackhawk Holding Corporation, 500,000 shares of which were issued for $1250—a price of four shares for one cent. The trial court held that the Class B shares "did not constitute shares of stock; that their issuance by the corporation was an invalid, *ultra vires* act; and was *void ab initio,*" because, to quote the majority opinion again, this stock "was not permitted to share at all in the dividends or assets of the corporation." If this was not the issue in the case, and the Class B stock had some heretofore unsuspected attributes, both the trial and the appellate courts, as well as this court, have wasted considerable time

and energy in considering an entirely academic matter.

The majority opinion states that "In the area of public policy we must consider that all requirements of the securities division of the office of the Secretary of State" have been met. The fact is, however, that the stated requirement that "the Class B stock be less than ⅓ of the total number of shares outstanding after the public offering" was not met in this case. After the public offering, which the record shows was closed on June 25, 1964, the number of shares of Class B stock substantially exceeded one third of the total number of shares outstanding. The total number of shares outstanding was 1,087,868, of which 500,000 shares were Class B stock. More important in the long run than the factual error, however, is the implication that the public policy of Illinois can be fixed by regulations issued by a Secretary of State. That implication runs counter to what I think is the correct view, stated elsewhere in the majority opinion, that "the public policy of a State must be sought in its constitution, legislative enactments and judicial decisions."

From section 14 of the Business Corporation Act which authorizes the issuance of classes of stock "(c) having preference over any other class or classes of shares as to the payment of dividends," and "(d) having preference as to the assets of the corporation over any other class or classes of shares upon the voluntary or involuntary liquidation of the corporation" (Ill. Rev. Stat. 1969, ch. 32, par. 157.14), the majority apparently concludes that the General Assembly has authorized a class of shares which is not just subject to a preference, but is totally excluded from sharing in dividends or in the assets of the corporation.

"Under our laws," say the majority, "the rights to earnings and the rights to assets—the 'economic' rights—may be removed and eliminated from the other attributes of a share of stock. Only the management incident of ownership

may not be removed." This seems to me to be saying that the ownership incidents of ownership may be eliminated. What remains, then, is a disembodied right to manage the assets of a corporation, divorced from any financial interest in those assets except such as may accrue from the power to manage them. In my opinion, what is left after the economic rights are "removed and eliminated" is not a share of corporate stock under the law of Illinois.

The governing statute, which has been in effect since 1957, defines "shares" as follows: " 'Shares' means the units into which the proprietary interests in a corporation are divided." (Ill. Rev. Stat. 1969, ch. 32, par. 157.2—6.) The words "proprietary interests," naturally interpreted, mean "ownership interests."

To avoid the result which the natural meaning of the words of the statute would compel, the majority reverts to a definition of "shares" which was replaced by the present definition in 1957. That definition was: " 'Shares' are the units into which the shareholders' rights to participate in the control of the corporation, in its surplus or profits, or in the distribution of its assets, are divided." (Ill. Rev. Stat. 1955, ch. 32, par. 157.2(f).) The majority then reads this provision as having authorized the issuance of shares of stock which do not represent any significant financial interest in the corporation, yet have the same right to vote as those shares of stock which do. It does so by emphasizing the disjunctive "or" in the superseded statute, so that it is read to mean that corporate shares of stock may represent either (1) an interest in the control of the corporation, divorced from an ownership interest in its surplus or profits or in the distribution of its assets, or (2) an interest in the corporation's surplus or profits, or (3) an interest in the distribution of its assets, apparently in dissolution. This interpretation of the earlier definition is then considered to control the meaning of the present definition because of a committee comment that stated: "The 1957 amendment

enacts the definition in the Model Business Corporation Act, which is simpler than that previously existing. There is no change in legal effect." 1 Ill. Bus. Corp. Act Ann., par. 2.6, comment, 2d ed. 1966, Pocket supp., p. 5.

The emphasis placed upon the use of "or" rather than "and" in the pre-1957 statute is obviously exaggerated, as a host of decisions of this court demonstrate. (See, *e.g., Moriarty, Inc.* v. *Murphy* (1944), 387 Ill. 119, 129-30.) Moreover, under the majority's disjunctive construction, shares of stock could represent a right to share in the corporate assets without a right to vote, a result which has been held to violate section 3 of article XI of the constitution of Illinois. *People ex rel. Watseka Telephone Co.* v. *Emmerson* (1922), 302 Ill. 300.

If the majority was correct in its interpretation of the pre-1957 statute, it would have been possible in Illinois to issue shares of stock which had no voting rights, or to give voting rights to persons other than owners, such as bondholders. But it was not possible. In *People ex rel. Watseka Telephone Co.* v. *Emmerson* (1922), 302 Ill. 300, a corporate resolution which deprived preferred stockholders of the right to vote for directors was held invalid. And a contract that purported to give bondholders the right to vote at stockholders' meetings was held void as against public policy in *Durkee* v. *People ex rel. Askren* (1895), 155 Ill. 354.

The only authority cited to support the issuance of shares of stock which "had voting rights only and lacked any substantial proprietary interest" is *Lehrman* v. *Cohen* (1966), 43 Del. ch. 222, 222 A. 2d 800. The Delaware court described the situation in that case in these terms: "From its inception [in 1935], the company was controlled by the Cohen and Lehrman families, each of which owned equal quantities of voting stock, designated Class AC (held by the Cohen family) and Class AL (held by the Lehrman family) common stock." In 1949, after the death of one of

the founders and ensuing disputes, a third class of voting stock, consisting of one share of class AD stock with a par value of $10, was issued to Joseph A. Danzanky, who had served as the attorney for the corporation.

Apart from the factual differences between this case and the *Lehrman* case, the Delaware statute there involved expressly permitted the issuance of stock that had no voting rights, and that fact played a significant part in the court's decision. The court said: "Non-voting stock is specifically authorized by section 151(a); and in the light thereof, consistency does not permit the conclusion, urged by the plaintiff, that the present public policy of this State condemns the separation of voting rights from beneficial stock ownership." (222 A. 2d at 807.) As has been pointed out, under Illinois law the issuance of non-voting stock was prohibited by section 3 of article XI of the constitution of 1870.

Mr. JUSTICE WARD concurs in this dissent.